**Affirmed and Opinion Filed July 1, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00207-CV

**JACQUELINE LOVELACE, Appellant**
**V.**
**DALLAS INDEPENDENT SCHOOL DISTRICT, Appellee**

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-05007**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Nowell

Jacqueline Lovelace appeals an order granting Dallas Independent School District's plea to the jurisdiction and dismissing her claim for retaliation under the Texas Commission on Human Rights Act (TCHRA). Lovelace sued DISD for retaliation under the TCHRA, alleging DISD terminated her employment in retaliation for her expressing opposition to discrimination. DISD filed a plea to the jurisdiction raising its governmental immunity from suit and challenged the existence of jurisdictional facts necessary to establish a waiver of immunity under the TCHRA. The trial court granted the plea and dismissed Lovelace's lawsuit. Lovelace argues on appeal that the record shows she engaged in a protected activity under the TCHRA and there is evidence of a causal connection between the protected activity and the adverse employment actions. We conclude Lovelace failed to produce evidence raising a fact question under the burden-shifting

framework applicable to retaliation claims based on circumstantial evidence. Therefore, she failed to establish a waiver of governmental immunity under the TCHRA. We affirm the trial court's order.

## BACKGROUND

Lovelace is African American. She was hired by DISD as an Executive Director in 2012. Executive Directors are responsible for the schools within their feeder system and the principals of those schools report directly to their Executive Director. Assistant Superintendents supervise the Executive Directors. Dr. Josie Hernandez-Gutierrez was the Assistant Superintendent for Lovelace's division. Dr. Karon Cofield took over Gutierrez's position after she resigned. The Assistant Superintendents are supervised by Dr. Sylvia Reyna, Chief of School Leadership.

Lovelace was responsible for thirteen schools, including Spruce High School and its feeder schools. Lovelace's responsibilities included supervising the principals of those schools. In July 2013, DISD gave Lovelace an excellent performance review for the 2012-2013 school year, stating she exceeded expectations in several categories.

In the summer of 2013, parents of Hispanic students at one of Lovelace's feeder schools, Burleson Elementary, complained they felt unwelcome at the school and ignored by the African-American principal, Yolanda Knight. On August 14, 2013, Lovelace sent an e-mail to her supervisor, Gutierrez, about the situation. Lovelace stated her desire to talk with Gutierrez about how an Hispanic parent "appears to be manipulating events and circumventing protocol in an effort to further her agenda of defamation and slander of Principal Yolanda Knight." In preparation for a meeting with the parent, Ms. Acosta, Lovelace felt it "gravely necessary" to point out "one specific thing before we move forward with what may prove to be a politically racial nightmare that further dichotomizes African-Americans and Latinos." Lovelace then complained about a meeting arranged by Gutierrez with Rene Martinez of the League of United Latin American

Citizens (LULAC) about the situation. Lovelace assumed a parent had contacted LULAC, but after Martinez stated he was never contacted by parents about the school or principal, Lovelace "left the meeting with the feeling that you had prompted this meeting but could not justify a logical reason why you would have done so since our role is to support our campus leadership publicly but reprimand and coach them privately."

Lovelace also complained that Gutierrez made contact with the parent during Lovelace's absence while taking classes in Austin. The parent told Gutierrez she did not want to speak with Lovelace, but Gutierrez never redirected the parent to follow protocol or attempt to bring in Lovelace to discuss her concerns. Lovelace reminded Gutierrez that she

> told you early on that [the parent's] decision not to meet with me could be seen as "racist" given the climate in Dallas and that she should not be allowed to proceed without first talking to me; however, you continued to meet with her and others without a postponement that would have included my presence. By doing this, you further placed yourself in a position of power and me in a position of marginalization.

Lovelace concluded:

> At this time, I understand that Ms. Acosta [parent] and Mr. Martinez [LULAC representative] are calling for the removal of Ms. Yolanda Knight [African-American principal]. I do not support this request and earnestly feel that I have not received support, coaching, and unbiased guidance from you as my supervisor to resolve this issue amenably. Your actions appear biased, unethical, and to have a racist tenor directed toward Ms. Knight and me. I will be at the meeting tomorrow evening supporting Ms. Knight as I would support any principal under my supervision, no matter the ethnicity, who champions the success for ALL scholars.

Lovelace spoke to Gutierrez both before and after the August 14, 2013 e-mail. According to Lovelace's declaration, Gutierrez "expressed a clear understanding that I was opposed to race discrimination in the actions of the DISD across the district and at Burleson Elementary at the time." Lovelace also stated in her declaration that she told Gutierrez that "DISD was acting in an unlawful racial manner which was only going to escalate into even worse racial problems." Lovelace stated that "meeting with LULAC and not the NAACP or any other African-American

organization" could be viewed as racist.

Gutierrez resigned in October 2013. In November, DISD informed Lovelace that Dr. Karon Cofield, an African-American, would become her supervisor beginning January 1, 2014. Lovelace contends Cofield began harassing her in December 2013, even before Cofield assumed her official duties. Cofield would randomly call Lovelace into her office to answer questions about anonymous complaints regarding Spruce High School. The meetings pulled Lovelace away from her work and interfered with her efforts to support principals and improve academic achievement. Lovelace claimed Cofield gave her a bad performance review in January 2014 without having the opportunity to adequately observe her performance.

On March 25, 2014, Lovelace sent a memo to Cofield expressing dissatisfaction with Cofield's oversight of the Spruce Feeder system. The memo began: "Due to the increasingly hostile nature of the work environment, the racial unfairness, inequitable treatment, and prolonged harassment, I feel it necessary to send you written responses to your questions concerning complaints received about the Spruce Feeder, especially its high school." Lovelace complained she was repeatedly questioned about items she had already investigated and reported on and was attacked based on anonymous complaints and gossip.

On March 31, 2014, Lovelace responded to an e-mail from another Executive Director regarding the scheduling of interviews for their shared administrative assistant. Lovelace declined to participate in the interviews because Cofield selected the other Executive Director as the primary evaluator of the administrative assistant and the unprofessional treatment of Lovelace's current administrative assistant, Ms. Meza. Lovelace also stated:

> Furthermore, the fact that Dr. Cofield, upon accepting the assistant superintendent role for our division, almost instantly removed me as Ms. Meza's primary evaluator and direct supervisor and made you her supervisor without consulting or sharing the reasons for the decision with me after she had been with me almost two years suggests that she values you and your judgement and that mine is unwelcome and undervalued; therefore, I would rather not be placed in a subservient position with

–4–

a peer again. Additionally, she gave you direction to conduct Ms. Meza's mid-year when she had been under my direct supervision. This further confirms that Dr. Cofield clearly finds me a transparent decision-maker in office affairs.

Lovelace copied both Cofield and Reyna with this e-mail.

Lovelace prepared a memorandum dated March 31, 2014 addressed to Reyna and Cofield with the subject: "racial discrimination, slander, bullying, and harassment." According to her declaration, she sent an e-mail with this memorandum attached to Reyna and Cofield on March 31, 2014. DISD presented evidence that the memorandum was never received by Reyna or Cofield.

DISD also presented evidence of performance issues with Lovelace. In the summer of 2013, DISD hired Lovelace's friend, Teno Sigmon, as principal for Spruce High School. Sigmon then hired Lovelace's daughter, Megan Frazier, as a teacher at Spruce High School. In September 2013, Reyna directed Lovelace to transfer her daughter to another campus outside of Lovelace's chain of supervision. Lovelace did not timely act on this directive and Frazier remained at Spruce High School for the entire fall 2013 semester. In November 2013, the district received conflict of interest complaints regarding Frazier's employment at a school under Lovelace's supervision and local media questioned the ethics of the situation.

In December 2013, Cofield met with Lovelace to discuss several concerns about the Spruce Feeder schools. They discussed that Lovelace's daughter was still working at Spruce High School despite Reyna's directive that she be transferred to another campus. They discussed Lovelace's failure to regularly clock in and out of work using the mandatory biometric clock and that principals under her supervision were also failing to use the clock consistently. Another concern was the failure to address high teacher vacancies and ensure that principals were attending job fairs as required by the district. They discussed an incident where Principal Sigmon opposed the enrollment of a student at Spruce High School although there was no basis to do so. Cofield

requested Lovelace ensure the student was permitted to enroll and report back to her. However, Lovelace did not timely update Cofield regarding the enrollment issue.

Cofield met with Lovelace again in January 2014 to discuss the concerns and expectations about Lovelace's performance. Cofield prepared a memo of understanding summarizing the topics of concern they discussed including: the hiring and reassignment of Lovelace's daughter; use of the biometric clock by Lovelace and her principals; student registration must be processed within the law and policy; hiring to fill teacher vacancies; and processing and consequences for student discipline. Cofield expressed that she had "serious concerns" about Lovelace's effectiveness and the assistance and support she provided to the Spruce Feeder schools. Cofield plainly stated, "You are not meeting essential and fundamental job functions at this time."

DISD continued to receive complaints from staff and parents about the conditions at Spruce High School in the spring of 2014. In March 2014, Reyna visited Spruce High School and observed "one of the most dysfunctional high school environments [she] had ever seen in [her] career." She found over fifty students unsupervised and socializing in the school gymnasium, a choir class practicing on its own with no teacher present, and students wandering the hallways without consequences. No school administrators were walking the hallways to maintain order and assure that classroom instruction proceeded in accordance with district standards. Reyna requested Christi Buell, another Executive Director, to visit Spruce High School to observe the instruction and climate at the school. Buell observed the situation at Spruce on four occasions in March 2014 and found several violations of district standards and a lack of leadership from the school's administration. She observed that students were unengaged in classrooms and roamed the halls during class. Administrators failed to observe classroom instruction and support teachers' professional development. Assistant principals complained to Buell about the lack of communication or focus on instructional leadership. The district also received complaints from

staff about Lovelace and Sigmon's performance.

On April 9, 2014, DISD terminated Lovelace's employment for the following reasons:

- You failed to comply with directives from your immediate supervisor.
- You failed to carry out your professional duties and responsibilities in managing parent and staff concerns.
- You failed to adequately manage and coach principals under you direct supervision.
- You failed to complete assignments issued by your immediate supervisor.
- You failed to effectively communicate with your immediate supervisor.
- You failed to maintain accurate personal attendance records.
- Finally, on March 31, 2014, you displayed poor judgment when you sent an email to a colleague that maligned your immediate supervisor. You also copied the immediate supervisor and the Chief of School Leadership on this email.

After exhausting her administrative remedies, Lovelace filed this lawsuit against DISD on May 1, 2015. She alleged DISD terminated her employment in retaliation for her opposition to discrimination. She argued it was discriminatory to invite a LULAC representative to discuss complaints about an African-American principal, the parent's decision not to meet with Lovelace "could be seen as racist," Gutierrez meeting with the parent in Lovelace's absence placed Lovelace in a position of marginalization, and Lovelace's August 14, 2013 e-mail stated that Gutierrez's "actions appear biased, unethical, and to have a racist tenor directed toward Ms. Knight and [Lovelace.]"

DISD filed a plea to the jurisdiction in July 2016 arguing it was immune from suit and Lovelace's claims did not fall within the waiver of immunity provided by the TCHRA. DISD challenged Lovelace's jurisdictional facts and presented supporting evidence. Lovelace responded with her declaration in opposition to the plea to the jurisdiction. DISD also filed a motion for summary judgment with supporting evidence. Both parties filed supplemental briefs and reply briefs on both the plea to the jurisdiction and motion for summary judgment. On January 30, 2018, the trial court, after hearing the arguments of counsel and considering the evidence attached to the plea and the supplements and replies, granted the plea to the jurisdiction and dismissed Lovelace's

suit.

**DISCUSSION**

### A. Standard of Review

Governmental units, including school districts, are immune from suit unless the state waives immunity. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). The TCHRA waives immunity when the plaintiff states a claim for conduct that actually violates the statute. *Id.*; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). Immunity from suit may be asserted through a plea to the jurisdiction which challenges the pleadings, the existence of jurisdictional facts, or both. *Clark*, 544 S.W.3d at 770. We review a trial court's disposition of a plea to the jurisdiction de novo. *City of Houston v. Houston Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 575 (Tex. 2018). Here, DISD's plea to the jurisdiction challenged the existence of jurisdictional facts with supporting evidence. In such cases, the standard of review mirrors that of a traditional summary judgment. *Clark*, 544 S.W.3d at 771. To avoid dismissal, a plaintiff must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction. *Id.* In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Id.* However, we cannot disregard evidence necessary to show context or evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Id.*

### B. Retaliation

The TCHRA waives immunity from suit only for statutory violations; thus a trial court lacks subject matter jurisdiction over the dispute absent some evidence the school district violated the TCHRA. *Clark*, 544 S.W.3d at 763. The elements of a claim under the TCHRA are jurisdictional in nature because "the Legislature has waived immunity only for those suits where

–8–

the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 136 (Tex. 2015) (quoting *Garcia*, 372 S.W.3d at 636).

The statutory claim at issue in this appeal is a retaliation claim under the TCHRA. The statute prohibits retaliation against an employee for engaging in certain protected activities. TEX. LAB. CODE ANN. § 21.055. To establish a violation, the employee must show that: (1) she engaged in an activity protected by the TCHRA, (2) an adverse employment action occurred, and (3) there exists a causal link between the protected activity and the adverse action. *Nicholas*, 461 S.W.3d at 137. An employee engages in protected activity when she "opposes a discriminatory practice." TEX. LAB. CODE ANN. § 21.055(1). Opposition to a discriminatory practice is a protected activity irrespective of the merits of the underlying discrimination claim. *City of Waco v. Lopez*, 259 S.W.3d 147, 151 (Tex. 2008). However, to establish an employee opposed a discriminatory practice, the employee must demonstrate a good-faith, reasonable belief that the underlying discriminatory practice violated the TCHRA. *Nicholas*, 461 S.W.3d at 137. The prohibition against retaliation does not protect an employee from all ostracism, discipline, or even termination following a protected activity. *Clark*, 544 S.W.3d at 764. Rather, a remedy exists only when the evidence establishes that a materially adverse employment action resulted from the employee's protected activities. *Id.*

An employee may prove its retaliation claim with either direct or circumstantial evidence of discriminatory intent. *See Garcia*, 372 S.W.3d at 634. Because direct evidence of discriminatory intent is rarely available, the three-part *McDonnell Douglas* burden-shifting framework permits an employee to raise a presumption of discrimination with circumstantial evidence. *Clark*, 544 S.W.3d at 782 (discussing the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the employee establishes a prima facie case of

discrimination, a rebuttable presumption of discrimination arises, which can support a discrimination claim if not rebutted. *Id*. The burden then shifts to the employer to defeat the presumption by producing evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. Once the presumption of discrimination is rebutted, the burden shifts back to the employee to produce evidence that the employer's stated reason is false and a pretext for discrimination. *Id*.

In *Clark*, the supreme court clarified that all parts of the burden-shifting framework are jurisdictional: "Consistent with our analysis in *Mission Consolidated Independent School District v. Garcia*, we hold that when jurisdictional evidence negates the prima facie case or, as in this case, rebuts the presumption it affords, some evidence raising a fact issue on retaliatory intent is required to survive a jurisdictional plea." *Clark*, 544 S.W.3d at 764.

## C. Application

We resolve this appeal under the third part of the burden-shifting analysis required by *McDonnell Douglas* and *Clark*. Thus, we assume for purposes of this appeal that Lovelace's August 14, 2013 e-mail to her supervisor and her later termination satisfy the prima facie case step of the burden-shifting framework. The burden then shifted to DISD to produce evidence of nondiscriminatory reasons for terminating Lovelace. DISD presented such evidence in its plea to the jurisdiction and supplemental filings, thereby rebutting the presumption. *See Clark*, 544 S.W.3d at 790 ("Assuming Clark stated a prima facie retaliation case based on her termination, any presumption raised by that has been rebutted because Alamo Heights produced evidence of many performance reasons for terminating Clark's employment."). The burden then shifted back to Lovelace to present evidence raising a fact issue that DISD's stated reasons for terminating her were merely a pretext for discrimination. *See id.*

Lovelace contends she was not required to produce evidence of pretext because *Clark* was

–10–

decided after the trial court ruled on the plea to the jurisdiction. Although *Clark* was decided after the trial court ruled in this case, *Clark* merely clarified existing law and the supreme court did not limit the retroactive application of its decision. Accordingly, we conclude Lovelace was required to present evidence raising a fact issue on the pretext requirement once the burden shifted back to her.

In *Clark*, the supreme court answered the question of whether all three steps in the *McDonnell Douglas* burden-shifting scheme are jurisdictional when a discrimination claim is raised against a governmental entity protected by governmental immunity. The court explained that because a circumstantial evidence case depends on the *McDonnell Douglas* framework, the burden-shifting scheme in total defines the jurisdictional facts. *Clark*, 544 S.W.3d at 783.

> If the jurisdictional evidence does not negate or rebut the prima facie case, the ensuing aspects of the burden-shifting analysis are not implicated in the jurisdictional inquiry. But if, as here, jurisdictional evidence rebuts the prima facie case, the entire *McDonnell Douglas* framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea.

*Clark*, 544 S.W.3d at 783. Once the defendant rebuts the prima facie case by producing evidence of a legitimate reason for its employment action, the plaintiff must present evidence raising a fact question "on the ultimate issue—whether retaliation caused the adverse employment action—to survive a jurisdictional challenge. The entire burden-shifting framework is a mechanism for proving discriminatory intent absent direct evidence, and all phases, not just the prima facie case, are relevant to the jurisdictional inquiry." *Id*. at 784. The court explained that its holding is supported by the core holding of *Garcia* and the reasoning "in *State v. Lueck*, *San Antonio Water System v. Nicholas*, and our Texas Tort Claims Act jurisprudence." *Id*. at 783–845 (citations omitted). Thus, the *Clark* decision did not announce a new rule of law that could not have been anticipated.

As a rule, the decisions of the Texas Supreme Court apply retroactively. *Baker Hughes,*

*Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999). A decision of the supreme court operates retroactively unless that court exercises its discretion to modify that application. *Bowen v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 100 (Tex. 1992) (per curiam). The supreme court did not exercise its discretion to limit the application of its *Clark* decision to future cases. "[I]t is solely the Texas Supreme Court's prerogative, not ours, to decide whether its decisions should have only prospective effect." *Balderas-Ramirez v. Felder*, 537 S.W.3d 625, 636 (Tex. App.—Austin 2017, pet. denied); *accord ViewPoint Bank v. Allied Prop. & Cas. Ins. Co.*, 439 S.W.3d 626, 631 n.4 (Tex. App.—Dallas 2014, pet. denied). Because only the supreme court has the power to say otherwise, we conclude that *Clark* applies to this case.

Lovelace argues that she disputed the stated reasons for her termination as a pretext for retaliation. She cites to her supplemental brief in response to the plea to the jurisdiction filed in the trial court. That supplemental brief includes the statement that "Lovelace shows pretext with evidence that the accusations against her are either false or not credible reasons that would have caused her termination, but for her opposition to the initial discrimination." However, neither the supplement brief filed in the trial court nor her appellate brief identifies any evidence in the record that the stated reasons were merely a pretext for retaliatory intent. Nor have we found any evidence in the record raising a fact issue as to the pretext portion of the *McDonnell Douglas* framework.

We conclude that Lovelace failed to satisfy her burden to present some evidence that DISD's stated reasons for terminating her employment were mere pretext for retaliatory intent. We overrule Lovelace's issues.

## CONCLUSION

Assuming Lovelace satisfied the prima facie case element of the *McDonnell Douglas* framework, she failed to present evidence raising a question of fact that DISD's stated reasons for terminating her employment were a pretext for retaliatory intent. Accordingly, she failed to

establish a waiver of governmental immunity under the TCHRA and the trial court properly granted the plea to the jurisdiction. We affirm the trial court's order.


/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

180207F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JACQUELINE LOVELACE, Appellant

No. 05-18-00207-CV          V.

DALLAS INDEPENDENT SCHOOL
DISTRICT, Appellee

On Appeal from the 298th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-15-05007.
Opinion delivered by Justice Nowell.
Justices Myers and Osborne participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Dallas Independent School District recover its costs of this appeal from appellant Jacqueline Lovelace.

Judgment entered this 1st day of July, 2019.